There are three major points I want to make to the Court today. Centegra was a legitimate business. It had entered the relevant market with sales. It had considerable evidence that established genuine issues of material fact on standing and all of the claims. And the district court committed an error because it requires Centegra to prove its case rather than determining whether the evidence established genuine issues of material fact. Well, if you lose on standing, then everything goes, right? Yes. So why don't you say what your best case is for having standing? Okay. I can do that in two ways. I can simply summarize my evidence or I can compare it to the criteria by Associated General Contractors and Sollinger. It would help me if I had your guidance in that way. Do you need it characterized for the criteria? If not, I'll just let you know. Well, I think we know what the law is, so just tell us what your evidence is that you have standing. Okay. Thank you. Centegra entered the market in November 2005. These posters are taken from – these posters are made from a piece of evidence on the record in this label. Defense counsel has just seen the first three, and that's the three I intend to rely on. This was obtained from a declaration submitted by IDF's employee, Mr. Dupree. In his declaration, he asserted that this was purchased in interstate commerce. This is Centegra's canine influenza flu product. It was sold by either MWI, the distributor, that also carries out experiments, or through the National Health Agency. This is a sales brochure for Gene Sentinel's comprehensive canine and canine panels, 29 pathogens, priced at $20. Did you say canine? Yes, canine. Aren't we dealing with feline testing? Centegra entered the market with its flagship canine flu test. This was a variant of the avian flu. It was discovered by Dr. Crawford at the University of Florida. So what Centegra did is they sped up their development so they could release this test early. This is the canine test? This is the canine. This was sold in interstate commerce, purchased by IDEX. But what you're talking about is the feline. We're establishing that Centegra was a business that had entered the market. But they need to enter the market for feline. So what evidence do you have that they entered the market for feline? The definition of the relevant market does not break into canine and feline. The relevant market is diagnostic sales for canine animals, cat and dog, in clinic and outside reference services. This happens to be a canine test. This is a combined canine and feline test. Centegra. I'll switch over to you. I just wanted to establish that Centegra had already entered the market. All right. It would probably be more helpful. I mean, generally speaking, we don't have exhibits in appellate courts. So you can refer us to excerpts in the record as far as that goes. So just stay at the podium and deal with your argument. So ER51 establishes that Centegra had sold canine influenza panels using molecular diagnostics in November 2005. It entered negotiations, commenced sales of these panels, ER51 Exhibit 5, its comprehensive feline and canine panels with up to 29 pathogens in February. It negotiated with Butler, MWI, and CSC, the key distributors of veterinary products, to carry Centegra's product and to order large volumes of the product. The evidence supporting that were emails between the distributors and Centegra, including emails from Mr. Ash at Butler in which he discussed the orders, the number of tests, the pricing of tests, and an escrow account. Had they done validation studies? Had they run validation studies? Yes, sir. And Dr. Ogi, you know, we call him Dr. Ogi. Okowumabua is his name. And he was the chief of microbiology and pathology at Wisconsin. He had a complete lab. He developed our probes, which were paid for. I didn't ask if he developed something. I asked have they sent it out and done validation testing on it, and had they filed with the Department of Agriculture, is it? That was an issue raised by defendants. Excuse me? That was an issue raised by defendants whether there was a need to file with the FDA. Centegra contacted the FDA, and the FDA said a license was not required. There was no need to acquire a license because the sample collection kits involved dry samples. Do you have validation studies in the record? Yes, we do. We have GeneDirect. Where on the record? Can you point me to a place in the record where there are validation studies on your feed line? One of the places is Dr. Ogi's declaration. And that is Dr. Ogi is his first name, and we tend to say that. It's Okawumabua. He was chief of pathobiology at the University of Wisconsin. He has his own department and diagnostic lab. He developed the probes, tested the probes, validated. They recognized the various pathogens. And that was introduced into the record. And I'm sorry. I mean, his ‑‑ I don't have handy his ‑‑ Had Centegra sold any of these tests at all? Centegra has not completed sales of these tests because all of the orders were cancelled. They had orders. They had orders from Butler, and the evidence of that was the e-mail communications because there was not a written order completed. We produced that evidence, and there was testimony, deposition testimony, and declaration testimony. After IDEX wrote the threatening letters that are on the record. I think we're familiar with the e-mails in the record. Do you have ‑‑ are there any invoices or unexecuted contracts with distributors in the record? Invoices of sales? Sales were not completed. Okay. So there's no invoices. No. There's no contracts, right? There are e-mails. I know what the ‑‑ I know the e-mails, but are there any contracts? No, there are not contracts produced with the distributors, correct? What did the e-mails say? The e-mails said that ‑‑ asked for pricing. And one of the e-mails from Mr. Asch noted that it was a substantial order, and they required an escrow account. And that's been produced to the court. And there's also a follow-up e-mail from Mr. Butler saying that a bird in the hand, that IDEX was a bird in the hand, and they could not continue the order from us because of IDEX's objections. And this was ‑‑ IDEX sent its letters in March 2006. The orders were all but completed by the end of February 2006. In what form did the orders take? Are they on a form that says I want to buy? No, there's a faxed ‑‑ not faxed, sorry, e-mails. I want to buy X number of kits. We want to buy this many kits. How much does it cost? Do we get a discount? And there's a series of e-mails establishing an escrow account. Because it was such a large order, Butler said that they wanted to establish an escrow account, and we said fine, and that was in the e-mails presented to the court. And then there's the follow-up letter saying, sorry, we can't proceed because IDEX is a bird in the hand, quote, unquote. And that was presented to the court. There are no invoices, completed contracts or sales, because Sintegra, every single distributor canceled every single order. Well, also, too, one of the factors for readiness to enter the market has to do with financing, correct? Yes. And it would appear to me from the record that we have before us that Sintegra didn't produce any evidence of adequate financing or attempts to secure adequate financing or consummated contracts. And so why aren't those two factors significant in whether Sintegra was ready to enter the market? Sintegra received $300,000 in private investment that I personally raised, but because I could not be a witness at the trial, there was nothing. I couldn't introduce anything. The rest were confidential documents with our corporate account. Okay. Well, then that's still not in the record, right? No, it's on the record. Well. That's on the record. What's on the record? That $300,000 was received in investment by the Ford Ranch. It's on the record. Okay. You've got five minutes and nine seconds. Well, I think what's best is, is there any ñ well, the reasoning behind the standing criteria, whether you call it Sollinger or Associated General or anything else, is is this the correct plaintiff to be in this court? Is there somebody who's better? There is no other plaintiff that is better suited to bring this case, because Sintegra was an early market entrant that was forced out. Is there a case that says who's the best, who would be the best person to be here? Competitors? Well, obviously the government can take action against someone if they're ñ I mean, competitors have to show readiness to enter the market, correct? The government's not a private party. It's the criteria for who's the best private party, because otherwise you have everybody coming out of the woodwork, and whether you have duplicative recovery and too many lawsuits against the defendant. Since 1999, when the CDC's decisions came down, there has not been a single plaintiff that has challenged IDEX on antitrust. That is because the new entrants that were mentioned by IDEX don't exist. Zologix has no appreciable market share. VDX was bought ñ its pathogens were bought by IDEX in January 2008. And VCA Antec, Fair Isaacs, Fair Isaacs divested its business for the FAST panels, and there are no FAST panels. So all the alleged new market entrants don't even exist or have no market share. We are the ñ so we are the best plaintiff, and we entered business. And that should give us standing. We were not given our day in court because of improper evaluation of the evidence. Thank you very much. You'll have about three minutes in rebuttal. Thank you. Good morning. Good morning, Your Honors. Robert Mallory and my colleague, Will Diaz, for the defendant, IDEX, and appellee. Let me see in my limited time whether I can jump to the core issues and particularly answering the questions that Judge Callahan just asked. Well, maybe just why is ñ I mean, they have talked about ñ I mean, standing, obviously. If standing that ñ if we get beyond standing, then there's other issues that we have to address. But let me ñ why is they've ñ Sintegra has a ñ why don't they have a background and experience in prospective business that they have an apparent business model, which purportedly uses a CAO with limited experience in supporting players with technical knowledge who support the technical aspects of the business. They do have the e-mails. Why ñ you know, why isn't that enough? Well, Your Honor, as the ñ this court in Sollinger indicated, there is the readiness to actually enter the market test that must be satisfied by a plaintiff, particularly one as here who's not been a market participant before. And as counsel stipulated here this morning, and it was a little more painful in the district court, there were no contracts of sale. There were no ñ You said there were no contracts of sale. Excuse me. You said there were no contracts of sale, but there were e-mails where people ñ companies inquire they want to buy it, and then because of the exclusive agreement, they cancel it. Well, Your Honor, first of all, not because of the exclusive agreements where they canceled. The agreements have no exclusionary effect whatsoever. I'll be happy to address that if you'd like. No, but they have the loyalty. They have the loyalty thing, and it's right on the records that your client, after finding out of the e-mails that both of the ñ that, you know, both of the contacted parties indicate that in light of IDEX intending to enforce the contract that they have, they're not going to do business with Sintegra. Well, as I'm sure this panel is aware, the seminal case, and one followed consistently here in this circuit on that issue, of course, is the Gilbarco case. And there ñ and I've actually been up twice in the last two years on that case, and what is an exclusionary contract. And the agreement in this case is so far afield from ñ That's not the point. That's not the point they're making. The point they're making is that the deals fell through because of the contract. We're not talking about whether the contracts are valid or not. We'll stipulate for the sake of discussion they're valid. Their point is because you had these contracts, they couldn't ñ these orders were canceled. What's your answer to that? The answer is that that is the conjecture from Mr. Brody, the opponent in this case, and the CEO who spent 20 percent of his time, his energy, his words, not mine, on this venture, 20 percent of his time, the rest were on hypoallergenic calves and other ventures, for which the $300,000 he testified in his deposition he raised was spent on. In fact, only $20,000 was traced to actual work done in connection with bringing these products to market, that is the products that are issued here. But just looking at those e-mails, one in particular came from TW Medical. Those are the three distributors to which counsel referred in her argument a moment ago. Mr. Zeller, whose deposition we tried to take, never could because the efforts to take discovery in this case were over the moon. I mean, the record, I think, is clear on that, all the orders, the ex-parties and so forth. He was never deposed, but we did call him in connection with summary judgment, and he gave us a declaration in which he says his reason for not, one of the reasons that he chose not to do business with Brody or Centegra was the fact that the product was way overpriced. It was three or four times what equivalent products were in the marketplace, and he had asked for and had been denied any sort of validation that the test would work, that this panel that they developed would work. Now, that's from one of the three distributors with whom they claim to have a relationship. What about the other two? Excuse me? The other two? The other two, we couldn't contact the other two. So is there evidence that the other two canceled the contract, canceled the orders because of the exclusivity agreement? I don't believe that. You've got the e-mail. Well, why don't those e-mails say what they say it says, that the orders were canceled because of the exclusivity agreements? Well, if that's true, Judge Silverman, if that's true, then the Ninth Circuit law and the rationale underlying what are barriers to entry absolutely don't honor that with any negative implication. We're not talking – we're not saying you lose the case. We're saying do they have standing to get into court. We're talking standing now. No, absolutely not. And why is because – okay, even say for a moment that two of the three distributors that were contacted chose under their agreements not to carry the product because they had a relationship with IDEX. That's a contention we don't think has been proven. But assuming that were true, that doesn't mean that this is a plaintiff that actually got to market. There was no product delivered. There were no actual sales. The plaintiff never had a laboratory to conduct the tests. It was pre-selling. That was the bizarre thing about this product. What in your view is the relevance of appellant's counsel talks about the canine vaccine? What is the relevance of the canine vaccine relative to this case? I believe none. They can – I think the reason for a reference to the canine vaccine is apparently somewhere along the line we came into possession of one and tried to test it. I don't know quite how that occurred. And I think the point is that she's trying to make is at least, you know, a single product got to market, but it's not one that our client competed with. We were in the failing market. We didn't – we weren't competing for that product. So that avian flu influenza product that she's referring to is not a product that my client IDEX even competed with. Yeah, but that's not the point. The point they're making is they're not working out of their garage. They're actually players in the veterinary diagnostic market. Well, I understand the argument. Okay, well, then what's the answer to that? Your answer is that we don't compete with that product. Okay, I understand you're not competing with that product. Their point is we're a serious player. We have other products on the market. Is the vaccine diagnostic? Excuse me. Is the vaccine a diagnostic product? I believe it has some diagnostic aspect to it. Because you list a product on a website, Judge Silverman, and because you make contact with three distributors out of 40 or 50 in the United States about carrying that product, doesn't bring the product to market. The product was not delivered. It was not sold. They didn't have the facility to conduct the tests necessary to effectuate the transaction. In other words, you buy one of these tests for $65 several times what the competition was charging. It required a laboratory to test the product and return the results of that test to the buyer, which happens to be the veterinarian. There was no agreement with a test laboratory. In fact, when I took Mr. Brody's deposition, he identified one laboratory that was going to be the laboratory that did business when they rolled out into the marketplace. But later on, when we found that there was no such agreement, no such dialogue, they came up with yet another name of a laboratory, but no contract, no agreement, no relationship. So what you're selling then is the product that was failing. For $85, you buy a product, which we've never seen. It's theoretical. It's listed right here. We've never seen the product, and one never got into the marketplace as far as we're able to determine. And there's no evidence in the record that it ever occurred. It was simply an idea. All right, let's assume for purposes right here that they never got a product into the market. Is it possible, though, that a person could be ready to enter the market without having actually entered a product? Could there be a case where they would have a business structure in place and, you know, maybe they have contracts? And, I mean, it would seem to me that there would arguably be a set of facts where someone could have standing and not have actually put a product into the market. Maybe they have a patent. Maybe they have, you know, maybe they have labs. Maybe they have employees. Maybe there's things along those lines. Judge Callahan, you're correct. It is possible that someone could not have actually sold a product in the marketplace and still be a potential competitor for purposes of standing under the antitrust laws. But counsel here, first of all, just the reference to the Associated General Contractor case is totally off point. That's not the point. Associated General Contractors is the plaintiff before the court. You have three levels of standing. You have Article III standing. They try to confuse that. We've never argued Article III standing. You have sort of target area or other iterations of that jargon, which means is the plaintiff one that would be within the zone of danger protected by the antitrust laws? That's Associated General Contractor. We've never made that argument either. In other words, a prospective potential competitor would pass that test. It's the further test of does the plaintiff have the ability to actually enter the marketplace? Have they either entered the marketplace or are they so preciously close to entering the marketplace realistically because they have their financing in place, their product line in place, here a test lab in place, either a means of going to market directly or through distributors in place and so forth, that the law will consider them participants in the marketplace for purposes of being a competitive complaint for an antitrust violation. And our point here is the judge bent over backwards. We went on and on about these issues. And at the end of the day, you have a plaintiff, Mr. Brody, who's spending part time basically in the garage, a piece of a house of someone that worked for him in another adventure. No other employees, no ability to test one of these products in the event it should be sold. The product never found its way into the marketplace. No employees, no equipment, no reference laboratory, no business plan, no dollars. And on validation, as I mentioned, TW Medical, one of the three contractors that they identify, actually asked for validation testing and it was denied. And, in fact, in the e-mail correspondence, one of IDEX employees, upon being contacted by Centegra to actually consider joint venturing or buying this product, asked for validation testing. It's in declarations received in evidence here and was denied. In other words, Mr. Brody said, I'm not giving it to you. And so far as we know, there's never been validation that this test that they're trying to sell for $89 even works. It was asked for by a distributor, so far as the record's concerned. It was requested by someone, an employee of our client. It was denied. And it's only in Mr. Brody's declaration that he did any validation testing. And, hence, the sum total of that is- What does that declaration have if you give all inputs in favor of the plaintiff? What does that declaration say about validation? Next to zero. In fact, I think I would rate it at zero. What Dr. Ogie does do is attempt to describe the benefits of this 27 combined tests that they were putting together as it relates to other products on the market. That was basically the thrust of that declaration. There is no attached validation testing. He doesn't say, I did validation testing of this product and here's what it showed. There's none of that. There is no validation testing. Do any federal regulatory agencies require validation testing to sell the product? Well, the most that I know about validation testing required for this product or approval by the federal government is what the plaintiff basically rolled out, which is they made this contact and- No, but my question was, does any agency require validation testing? To my knowledge, there's not an agency requirement of validation testing, but I can't tell you, Your Honor. What I'm getting at is, does the lack of validation testing mean they can't sell the product is what I'm getting at. Because I will not step beyond the bounds of what the record will show. I know of nothing in the record that establishes that federal or state approval of this device they were trying to roll out is required before it could be sold. What I do know is that the marketplace sought validation testing, and in fact, there's a citation in the record, Your Honor, to the largest and most respected association of laboratories, and laboratories are members, so are veterinarians are members. So essentially, lack of validation in and of itself can't prove that someone's not ready to enter the market. It's a factor that you're arguing in totality meant they weren't ready to enter the market. The point I was just going to make, Judge Callahan, is that the association of buyers, it's in the record, and I could give you the exact name of it if you want me to. It's in the record. It's in our brief. The association, in one of the documents attached to one of the declarations and received in evidence, said that there has been no validation testing of the product to the knowledge of the marketplace, and therefore, we see no validity in the product. In other words, they stood against its purchase or use in the marketplace, and for purposes of the antitrust law, it's not approval by a federal agency that counts. It's whether or not the product would receive acceptance by the consumer. I see your time is up, so if you finish your sentence and then we'll... So in this instance, we believe there would be no consumer acceptance because there was no validation testing. Indeed, it was refused. Thanks, Mr. Mallory. Thank you. Ms. Mandel, you have about three minutes and change left. Judge Fernandez, a canine vaccine would be therapeutic. It was a canine diagnostic panel, and it used the exact same technology as the feline and canine comprehensive panels. The molecular detection, you could detect one or 50 pathogens. This was one pathogen because we wanted to get the avian flu variant out. I can summarize. You said the vaccine is therapeutic? Yes, and it wasn't a vaccine. It was a diagnostic panel. I think you misunderstood what the product was. It wasn't the relevant market. Just look at how the incumbent monopolists reacted to Syntegra's entry. They wrote threatening letters to their distributors. The distributors canceled the orders. Why would they do that if we weren't a competitive threat? If we weren't going to enter the marketplace, they should have ignored us. They did not. In Clayton, Section 7 mergers, one of the ways the Court assesses entrance into the market and competition is how the incumbent monopolist perceives what the plaintiff has done to become a competitor. Why did they need to write those letters saying that we directly competed with their SNAP in-clinic diagnostic tests and they would not be able to carry IDEX products if we were not a viable competitor? Why bother? I think that says it all. The monopolist expert in diagnostics, the main company in veterinary diagnostics, thought we were a threat. You can't be a threat if you're not a proper plaintiff, if you're not even a competitor or a potential competitor. You're not a threat.  Ms. Mallory, thank you as well. The case was argued as submitted. Good morning. 0756720, Consolidated Freightways v. Aetna. Each side will have 10 minutes. Are we ready to go? Thank you.
judges: Fernandez, Silverman, Callahan